# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

_____

**No. ACM 39811**

_____

**UNITED STATES**
*Appellee*

**v.**

**Jordan L. HICKMAN**
Airman First Class (E-3), U.S. Air Force, *Appellant*

_____

Appeal from the United States Air Force Trial Judiciary

Decided 22 January 2021

_____

*Military Judge:* Mark W. Milam (arraignment); Willie J. Babor (motions); Christina M. Jimenez.

*Approved sentence:* Dishonorable discharge, confinement for 3 years, forfeiture of all pay and allowances, and reduction to E-1. Sentence adjudged 20 June 2019 by GCM convened at Ramstein Air Base, Germany.

*For Appellant:* Major Meghan R. Glines-Barney, USAF.

*For Appellee:* Lieutenant Colonel Brian C. Mason, USAF; Major Matthew L. Tusing, USAF; Mary Ellen Payne, Esquire.

Before POSCH, RICHARDSON, and MEGINLEY, *Appellate Military Judges*.

Judge MEGINLEY delivered the opinion of the court, in which Senior Judge POSCH and Judge RICHARDSON joined.

_____

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

_____

MEGINLEY, Judge:

Contrary to his pleas, a general court-martial composed of a military judge sitting alone found Appellant guilty of one specification of sexual assault, in

violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920, and one specification of larceny, in violation of Article 121, UCMJ, 10 U.S.C. § 921.[1] Appellant was sentenced to a dishonorable discharge, confinement for three years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved the sentence as adjudged.

Appellant raises three assignments of error on appeal: (1) whether the evidence is legally and factually sufficient to support his sexual assault conviction; (2) whether the omission of an appellate exhibit renders the record of trial incomplete;[2] and (3) whether Appellant is entitled to new post-trial processing because of an error in the staff judge advocate's recommendation (SJAR). Finding no error materially prejudicial to the substantial rights of Appellant, we affirm the findings and sentence.

## I. BACKGROUND

Appellant entered active duty in June 2017 and was stationed at Ramstein Air Base, Germany, where he committed the offenses. On 4 May 2018, between 2100 and 2130 hours, JC, the victim in this case,[3] attended a party being held in a common room at his dormitory, wearing a "Chewbacca" onesie.[4] JC did not recall having any drinks prior to going to the common room. Once he arrived,

---

[1] Unless otherwise noted, references to the Uniform Code of Military Justice (UCMJ) and Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2016 ed.). Appellant's case was referred to trial on 21 December 2018.

[2] Appellant argues the record of trial (ROT) is incomplete because an appellate exhibit is missing. Based on our review of the ROT, including the transcript of proceedings, we determine that the missing exhibit is a slide presentation used by trial counsel in findings argument. We are confident that the omission is insubstantial and the ROT is substantially complete. *See United States v. Henry*, 53 M.J. 108, 111 (C.A.A.F 2000). Accordingly, we find the omission of the appellate exhibit is harmless and did not prejudice Appellant or hinder this court's statutory duty to conduct appellate review under Article 66, UCMJ, 10 U.S.C. § 866. We find this assignment of error does not require further discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

[3] At the time of the offense, JC was an active duty Airman.

[4] The court notes that "Chewbacca" is a character from the "Star Wars" film franchise. May 4th is referred to by fans as "Star Wars Day," as a pun off a notable saying in the films, "May the force be with you." Additionally, according to JC, the onesie is similar to a one-piece pajama set with a zipper that extended to just below JC's bellybutton towards his waist. It did not have covered feet or socks, and in JC's words, "stopped like regular jogger pants." It also had a hood at the top of the head.

he started drinking beer, and later, drank "jungle juice."[5] At trial, JC recalled drinking eight to nine cups of jungle juice throughout the evening.

At some point in the evening, security forces personnel were called to the dormitory because the party became too loud. The party moved to a pond next to the dormitory after security forces left. JC's last memory of that night was walking from the pond to a pavilion, where he stood on the table and yelled, "May the fourth be with you, motherf**kers."[6]

Because the Government charged Appellant with assaulting JC while he was incapable of consenting due to impairment by alcohol, the trial counsel presented evidence tending to show JC's condition before the sexual assault. Towards the end of the night, Senior Airman (SrA) MB saw JC lying on a bench. SrA MB asked JC if he wanted to go home in which JC said yes. SrA MB, along with another Airman, helped walk JC to his dorm room, noting JC was not able to walk well and was a little disoriented. Towards the end of the walk, SrA MB stated JC was like "dead weight to carry" and JC was mumbling incomprehensibly. SrA MB stated it was an eight- to ten-minute walk from the pavilion to JC's dorm room.

When they arrived at the dormitory, SrA MB asked JC where his room was located. JC did not verbally respond, but "pointed up." JC was able to tell SrA MB his keys were in his pocket. SrA MB put JC on the ground while he and others searched for JC's room. Having found his room, approximately four people helped carry JC up the stairs, including SrA MB, SrA DB, A1C LM, and Appellant. SrA DB testified JC was "being dragged" to his room and "was also not in a good mental state. I believe he was crying." The Government introduced surveillance videos taken by cameras at JC's dormitory. According to the timestamp on the video evidence, JC was brought to his room at approximately 0009 on 5 May 2018.[7]

---

[5] A1C KM, who made the "jungle juice," testified that the drink contained rum, vodka, gin, and tequila, mixed with Hawaiian punch.

[6] A witness took a "Snapchat" video of JC standing on the table drinking out of a bottle. The video was recorded at 0005 on 5 May 2018 according to the witness who made it. "Snapchat" is a popular social media application.

[7] The Snapchat video of Appellant drinking at the pavilion was taken at 0005, whereas the dormitory video of Appellant being taken to his room was recorded at 0009. Given that the walk from the pavilion was no less than eight minutes, the court notes a possible time discrepancy between those two videos. The court also notes that any references to timestamps on the dormitory videos in this opinion are to timestamps located in the upper right corner of the videos.

A1C LM testified that he was in his dorm room when he heard people outside. He left his room and saw JC lying down on the ground outside the dormitory on his stomach. A1C LM stated JC was "crying, really upset," talking about an individual who had committed suicide in the dormitory. A1C LM helped carry JC, as "he wasn't walking at all." A1C LM stated that JC eventually calmed down, laid down on his bed, and fell asleep. A little after 0300, A1C LM went to JC's room to check on him, and according to A1C LM, the light was still on in JC's room, JC was still in his onesie, and it looked like he was in the same position that A1C LM had left him.

A1C BR, who was also present when the group carried JC to his room, testified JC was "yelling hysterically and just being really loud." A1C BR related that JC was yelling "random things," but it was not intelligible. Once they entered JC's room, "[a]t first he wasn't wanting to calm down," but as soon as the group put him into bed, he settled down, passed out, and went to sleep.

SrA MB's observations of the scene were as follows:

> There [were] quite a few people in his room. Everyone just kind of—someone's grabbing water, someone's grabbing the trash bin. It's pretty hectic. Everyone is around. Once that happens, I was towards the door making sure—I was just asking [JC], are you okay? I don't know if he threw up or not at that point. I didn't actually see anything. I thought he did because there was something on my shirt. I wasn't for sure . . . I don't know who the gentleman was, but there was another man and he said he was going to be looking after [JC].

SrA MB testified that when he left the room, JC was wearing the "onesie type thing," but it was down to his hips. JC also did not have a shirt on. SrA MB stated that once "the guy" said he was going to watch JC, SrA MB and A1C NC left.

Appellant, who did not live on Ramstein Air Base, planned to spend the night in A1C RM's dorm room. A1C RM testified that at some point after JC was brought to his room, Appellant told A1C RM he was leaving to "check on the person that was taken to his room." A1C RM did not know how long Appellant was gone. A1C RM also noted that that Appellant was "probably not really intoxicated. Like maybe buzzing, but that's about it."

A1C NC testified the group left JC's door cracked so that they could check on JC throughout the night to make sure he would be okay, which A1C NC and A1C LM did several hours later. He also stated that they took JC's arms out of his onesie so he would not overheat.

JC woke up on 5 May 2018 between 1300 and 1400. He was on his mattress without any sheets "huddled up against the wall side of the bed." JC realized

his knee and arm were wet, and believed that he had urinated on himself as he slept. JC eventually got up to go to the restroom. When he went to sit down on the toilet, JC said his rectum "was hurting abnormally," which was a sensation he had never had, and opined his pain level was a seven or eight out of ten. JC felt this "[pain for] two to three weeks."

After he pulled up his underwear (boxer shorts), he felt a "sticky kind of crust" on his right buttock, but went back to his bed. As his "consciousness" started to come back, he could feel the pain in his body, so he got back up and took a shower. Sitting in the shower for 30 minutes to an hour, the pain JC was experiencing did not subside. After he got out of the shower, JC noticed the boxers he had been wearing the night before were on the floor, and he had a different pair of boxers on when he woke up. He also noticed his entire room smelled like urine, and that the clothing he was wearing was also wet. Finally, he realized that his "PlayStation 4" (PS4), a video gaming system, was missing.

JC got dressed and went downstairs to the common room, where he found the dormitory emergency contact information, as he wanted to see if the dormitory manager would let him look at video camera footage taken outside his room. When the manager denied his request, JC, who stated he was still intoxicated, walked to meet with security forces, where he told them what had happened, including that he thought he had been sexually assaulted. JC was taken to the hospital, where a sexual assault forensic examination was performed.

Air Force Office of Special Investigations (AFOSI) agents initiated an investigation based on JC's report. Reviewing the video footage from JC's dormitory, and conducting interviews of people who were at the party, agents were able to identify the individuals who helped carry JC to his room. Appellant was identified as one of those individuals in the video.

The video footage from the dormitory shows that at 0047, two Airmen (identified as A1C LM and A1C NC) went back to JC's room, apparently to check up on him, and stayed for about one minute. Approximately 75 seconds after A1C LM and A1C NC left, Appellant entered JC's room without knocking. Within two minutes, Appellant shut the door. The video later shows Appellant, at 0107, leaving JC's room and carrying a white box, which JC would later identify as his stolen PS4. JC testified that, other than a single interaction with Appellant at a club, he had no contact, much less any relationship, with Appellant.

After identifying Appellant in the video, and pursuant to a verbal search authorization and with Appellant's consent, AFOSI agents searched Appellant's room. Agents seized the PS4 that Appellant was seen taking on the dorm video. Agents also obtained a DNA swab from Appellant and sent both it and

JC's underwear to the United States Army Criminal Investigation Laboratory (USACIL) for DNA analysis.

Ms. MC, a forensic biologist employed by USACIL, testified for the Government. Ms. MC analyzed JC's sexual assault kit, which included rectal swabs from JC, the known DNA standards from Appellant and JC, and JC's underwear. Ms. MC first "tested the rectal swabs" and "identif[ied] semen on the rectal swabs." Ms. MC then performed a DNA analysis which determined that "the semen DNA profile . . . was consistent with originating from two individuals." Ms. MC compared the DNA profile of the semen against the "known standards of [JC] and [Appellant]," and concluded that, assuming one profile was from JC, the remaining DNA profile was consistent with Appellant's. Ms. MC further testified that based on her analysis, the DNA profile of the semen on the rectal swabs was "at least one quintillion times more likely" to have originated from JC and Appellant than from JC and an unknown individual.

At some point, A1C JK, a friend of Appellant, heard that Appellant was a part of an investigation "about something that happened during that night at the dorm." A1C JK pressured Appellant to tell him what happened. Appellant told A1C JK, "it was a onetime thing," and that Appellant "just want[ed] to try it."

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Law

We review issues of legal and factual sufficiency de novo. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold

to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted), *cert. denied*, __ U.S. __, 139 S. Ct. 1641 (2019).

The "government is free to meet its burden of proof with circumstantial evidence." *Id.* (citations omitted). This includes proving an accused's knowledge. *See United States v. Curtin*, 9 U.S.C.M.A. 427, 432 (C.M.A. 1958).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

Appellant was convicted of sexual assault while JC was incapable of consenting due to impairment by alcohol, in violation of Article 120, UCMJ. The Prosecution was required to prove three elements beyond a reasonable doubt: (1) that Appellant committed a sexual act upon JC by causing penetration, however slight, of JC's anus by Appellant's penis; (2) that JC was incapable of consenting to the sexual act due to impairment by alcohol; and (3) that Appellant knew or reasonably should have known of the impairment. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 45.b.(3)(f).

With regard to consent, the statute explains,

> [t]he term "consent" means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance or submission resulting from the use of force, threat of force, or placing another person in fear does not constitute consent. A current or previous dating or social or sexual relationship by itself or the manner of dress of the person involved with the accused in the conduct at issue shall not constitute consent.

*See MCM*, pt. IV, ¶ 45.a.(g)(8)(A). The statute further explains that "[a] sleeping, unconscious, or incompetent person cannot consent." *See MCM*, pt. IV, ¶ 45.a.(g)(8)(B). "Lack of consent may be inferred based on the circumstances of the offense. All the surrounding circumstances are to be considered in determining whether a person gave consent, or whether a person did not resist or

ceased to resist only because of another person's actions." *See MCM*, pt. IV, ¶ 45.a.(g)(8)(C).

The affirmative defense of mistake of fact as to consent requires that an appellant, because of ignorance or mistake, incorrectly believe that another consented to the sexual contact. *See* Rule for Courts-Martial (R.C.M.) 916(j)(1). In order to rely on this defense, Appellant's belief must be honest and reasonable. *See id.*; *United States v. Jones*, 49 M.J. 85, 91 (C.A.A.F. 1998) (quoting *United States v. Willis*, 41 M.J. 435, 438 (C.A.A.F. 1995)); *United States v. Gans*, No. ACM 39321, 2019 CCA LEXIS 162, at *14 (A.F. Ct. Crim. App. 11 Apr. 2019) (unpub. op.). Once raised, the Government bears the burden to prove beyond a reasonable doubt that the defense does not exist. R.C.M. 916(b)(1); *see United States v. McDonald*, 78 M.J. 376, 379 (C.A.A.F. 2019). Yet, the "burden is on the actor to obtain consent, rather than the victim to manifest a lack of consent." *McDonald*, 78 M.J. at 381. An "[a]ppellant's actions could only be considered innocent if he had formed a reasonable belief that he had obtained consent. The Government only need[s] to prove that he had not done so to eliminate the mistake of fact defense." *Id.*

### 2. Analysis

Appellant argues there was no evidence that the rectal swabs taken from JC were obtained from JC's rectum, as the Government did not present any testimony regarding the collection of the rectal swabs, and did not prove beyond a reasonable doubt that Appellant penetrated JC's anus. While there was no testimony from a witness with personal knowledge of the collection of these swabs, questions about the integrity of the collection are dwarfed by the other corroborating evidence supporting our finding that Appellant's conviction is factually and legally sufficient.

If nothing else, the DNA analysis proves that Appellant engaged in sexual contact with JC, as Appellant's semen was found on JC. JC testified about the pain he felt in his rectum, a pain which lasted for two to three weeks, which led him to report a sexual assault. The video footage from outside JC's dorm room shows Appellant enter the room, shut the door, and remain for approximately 17 minutes. Additionally, the trial counsel presented testimony from A1C JK, who testified Appellant told him, "it was a onetime thing," and that Appellant "just want[ed] to try it." We find that under these circumstances a rational factfinder could determine that Appellant committed the charged sexual act on JC.

We next turn to whether the Government proved that JC was incapable of consenting due to impairment by alcohol. The testimony and evidence admitted at trial overwhelmingly shows JC was incapable of consenting to any sexual act with Appellant. The Snapchat video that was taken shortly before JC

returned to his dormitory shows him drinking and clearly intoxicated. JC needed assistance to walk back to his room from the pavilion. Once he arrived at his dormitory, and as he was laying on the ground, JC could not communicate the location of his room other than pointing up. The surveillance video shows JC being dragged and carried up the stairs by multiple Airmen. The testimonies of Airmen who came to his aid establish a collective concern about JC's well-being because of his impairment. Additionally, at 0047, less than 40 minutes after bringing him to his room and about two minutes before Appellant re-entered the room, when A1C LM went back to check on JC, he observed that "[JC] was laying [sic] in the same position [as they had left him], [and] hadn't moved." Finally, although JC was never asked at trial whether he consented, or whether he was able to consent to having sexual activity with Appellant, from JC's testimony about what he could remember, including the facts that he soiled himself in his sheets and was wearing a different pair of underwear when he awoke in the morning, we can reasonably infer JC was incapable of consenting to sexual activity with Appellant.

During his cross-examination of the Government's forensic psychologist, civilian defense counsel referenced statements made by Appellant to AFOSI, which alluded to the possibility that JC was capable of consenting to a sexual act with Appellant, and that Appellant labored under a mistaken belief that JC consented to the sexual act. However, no evidence was admitted to support such a claim. The evidence shows that Appellant was an opportunist who entered into another Airman's room for the explicit purpose of sexually assaulting a virtual stranger, with whom he had no relationship. We find that a rational factfinder could infer from the facts and circumstances that JC would have been incapable of consenting to sexual activity with Appellant during the 17 minutes Appellant was in JC's room.

Finding JC was incapable of consenting, we look to the last element of this offense, in that JC's condition was known or reasonably should have been known to Appellant. Again, strong direct and circumstantial evidence shows the Government met its burden. Testimony and video evidence indicate that Appellant helped carry JC to his room and was present as the group tried to calm JC and convince him to sleep. Furthermore, there was testimony from A1C RM that Appellant told him he was going to help JC get to his room safely as the group was trying to get JC to his room. Later, Appellant, who was spending the night in A1C RM's dorm room, and according to A1C RM, was not that intoxicated, told A1C RM he was leaving to check on JC and would return. A rational factfinder could determine that Appellant knew or should have known JC was incapable of consenting to the charged sexual act.

The evidence shows that a rational factfinder could conclude that Appellant's sexual assault of JC was planned and calculated. That is, knowing that

JC was incapable of consenting, Appellant feigned concern for JC, only to lie in wait for an opportunity to sexually assault him. In assessing legal sufficiency, we are limited to the evidence produced at trial and are required to consider it in the light most favorable to the Government. In doing so, we conclude a rational factfinder could have found beyond a reasonable doubt all the elements to support Appellant's conviction of sexual assault against JC. Furthermore, in assessing factual sufficiency, after weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's conviction of sexual assault against JC both legally and factually sufficient.

## B. Claim of SJAR Error

### 1. Law

Proper completion of post-trial processing is a question of law that this court reviews de novo. *United States v. Sheffield*, 60 M.J. 591, 593 (A.F. Ct. Crim. App. 2004) (citing *United States v. Kho*, 54 M.J. 63, 65 (C.A.A.F. 2000)). Failure to timely comment on matters in the SJAR, or matters attached to the recommendation, forfeits any later claim of error in the absence of plain error. R.C.M. 1106(f)(6); *United States v. Scalo*, 60 M.J. 435, 436 (C.A.A.F. 2005). "To prevail under a plain error analysis, [the appellant bears the burden of showing] that: '(1) there was an error; (2) it was plain or obvious; and (3) the error materially prejudiced a substantial right.'" *Scalo*, 60 M.J. at 436 (quoting *Kho*, 54 M.J. at 65). Although the threshold for establishing prejudice in this context is low, the appellant must nonetheless make at least some "colorable showing of possible prejudice in terms of how the [perceived error] potentially affected [his] opportunity for clemency." *Id.* at 437.

R.C.M. 1106(d)(4) states:

> The staff judge advocate or legal officer is not required to examine the record for legal errors. However, when the recommendation is prepared by a staff judge advocate, the staff judge advocate shall state whether, in the staff judge advocate's opinion, corrective action on the findings or sentence should be taken when an allegation of legal error is raised in matters submitted under R.C.M. 1105 or when otherwise deemed appropriate by the staff judge advocate. The response may consist of a statement of agreement or disagreement with the matter raised by the accused. An analysis or rationale for the staff judge advocate's statement, if any, concerning legal error is not required.

**2. Analysis**

Appellant asserts that this court should reassess his sentence or remand the case for a new convening authority action because the SJAR incorrectly stated, "The defense did not allege legal error." Appellant argues this statement "was made before [he] was given the opportunity to submit matters to the convening authority for clemency," and in turn, impacted his "decision whether to submit matters at all" and left "the Convening Authority with incorrect information."

We agree it was premature for the staff judge advocate to state that "[t]he [D]efense has not alleged error" in the SJAR if referring to matters submitted under R.C.M. 1105. Yet, when given the opportunity to address the incorrect language in the SJAR, neither Appellant nor his trial defense counsel chose to do so, as Appellant waived his right to submit clemency matters. Finally, even in the appellate processing of his case, Appellant has failed to identify what, if any, legal error is at issue.

Based upon the staff judge advocate's recommendation to approve the findings and sentence as adjudged, we find that any further discussion would have only reinforced the staff judge advocate's position that no corrective action was necessary. The convening authority indicated in his indorsement to the addendum to the SJAR that he considered post-trial submissions, which would include Appellant's waiver. The convening authority followed the staff judge advocate's recommendation and approved the findings and sentence as adjudged.[8] We find no colorable basis to conclude the convening authority would have acted differently had the staff judge advocate not included this language in the SJAR. This assignment of error is without merit.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c).

---

[8] The convening authority had no power to affect the findings, and, as to the sentence, had the power to affect the forfeitures and reduction in grade only. *See* Article 60(c)(4), UCMJ, 10 U.S.C. § 860(c)(4).

Accordingly, the findings and the sentence are **AFFIRMED**.



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court